**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                           No. 97-4036

DAVID M. ROBINSON,
Defendant-Appellant.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
 William M. Nickerson, District Judge.
(CR-95-479-WMN)

Submitted: October 9, 1998

Decided: November 13, 1998

Before LUTTIG and MOTZ, Circuit Judges, and
HALL, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

David M. Robinson, Appellant Pro Se.  Barbara Slaymaker Sale,
Assistant United States Attorney, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

David M. Robinson appeals his conviction and sentence pursuant to a guilty plea for mail fraud, in violation of 18 U.S.C. § 1341 (1994), and wire fraud, in violation of 18 U.S.C.§ 1343 (1994). Robinson received an eighty-five month term of imprisonment and was ordered to pay restitution in the amount of $953,255.31. Robinson moved to proceed pro se on appeal, and we granted his motion. Robinson makes several ineffective assistance of counsel claims. He also assigns error to the district court's calculation of actual loss under U.S. Sentencing Guidelines Manual § 2F1.1 (1995), application of a two-level enhancement for acting on behalf of a religious or charitable organization under USSG § 2F1.1(b)(3)(a), and determination that loss attributed to uncharged relevant conduct be included in the restitution order. Finding no error, we affirm.

Robinson met Morris Vickers in 1991. Vickers was an ordained Baptist minister who also had extensive training in retirement planning and operated a financial planning business known as Financial Security Advisors. Vickers developed an idea for a retirement plan for persons employed by non-profit organizations. He wanted to submit his idea to the Internal Revenue Service (IRS) for its review and approval. Robinson represented that he was a practicing attorney in this area and drafted the documents for Vickers and submitted them to the IRS. Vickers decided to market the plan as a separate business and incorporated Financial Diversified Services (FDS) for that purpose.

Vickers asked Robinson to join him as an equal fifty percent shareholder of FDS, based upon his understanding of Robinson's expertise. Vickers and Robinson agreed that Robinson would hold the title of President, and Vickers would be FDS's Chief Executive Officer. Throughout almost the entire period that Robinson defrauded FDS, Vickers remained in full-time employment with the Arundel Baptist Association. Robinson managed FDS on a day to day basis. Even after Vickers joined FDS on a full-time basis, Robinson continued to be responsible for managing the company's finances. In 1993, Robinson persuaded Vickers to seek funds for FDS and invest them with

2

a fictitious investment partnership, Zinman & Associates, promising a return of twenty-five percent in a three-month period.

In 1992, Robinson learned that two ministers had organized an interfaith group of ministers who met periodically to discuss issues of mutual concern. Robinson suggested to the two ministers that the organization be incorporated and prepared the articles of incorporation under the name of The Minister's Roundtable, Inc. (TMR). Robinson assumed the titles of treasurer and legal counsel for TMR. The financial matters of FDS and TMR soon became linked due to Robinson's roles in both organizations. Robinson arranged for Vickers to make presentations to TMR regarding financial planning for the ministers and their churches. Robinson also suggested that he and Vickers solicit loans for TMR to finance its activities such as speaker's expenses and funding outreach ministries. Robinson suggested that the loan proceeds be invested with the fictitious investment partnership and the interest earned that exceeded the amounts due on the loans could finance TMR's activities.

From October 1993 to April 1994, Robinson induced Vickers to solicit funds from various individuals to invest with either FDS or TMR. The individuals who loaned money to the organizations received promissory notes guaranteeing repayment in one year at interest rates between seven and fourteen percent. Robinson then drafted letters from the fictitious investment partnership to himself falsely representing that the funds invested were accruing twenty-five percent interest every ninety days. Robinson prepared balance sheets for FDS showing the substantial funds invested with the investment firm. However, during this period, Robinson embezzled and diverted to his own use all of the funds that he represented to Vickers were invested with Zinman and Associates for FDS. Of the total of $573,500 FDS received from its clients, $170,871 was used to purchase eight lots of property known as the Piscataway Estates. Vickers approved the purchase of these properties.

At approximately the same time that the FDS and TMR schemes were ongoing, Robinson organized another investment venture known as International Investment Consortium, Inc. (IIC). While fraud related to this venture is not a part of Robinson's criminal charges, he stipulated in the plea agreement to his fraudulent activities related to

3

IIC and agreed that the restitution order would include these losses. The sentencing court found that Robinson's activities with IIC were relevant conduct. IIC's purpose was to use its investors' funds to purchase run-down real estate in Baltimore, renovate it, and resell the properties at a profit. IIC received approximately $200,000 in funds from over forty investors. IIC eventually purchased and attempted to renovate three properties, all titled in Robinson's name. One of the properties, the North Payson Street property, was renovated and resold at a profit. One of the two remaining properties, Hilton Street, was renovated. Robinson then took out a second mortgage against the property and kept the proceeds. The third property was foreclosed upon because Robinson did not make the mortgage payments. Some of the IIC investors were also investors in FDS and TMR, and the Government considered the IIC scheme to be part of the same course of conduct or common scheme as the FDS and TMR frauds.

On December 7, 1995, the Government filed an indictment against Robinson for numerous mail and wire fraud violations. Robinson subsequently pled guilty to one count each of mail fraud and wire fraud. The court accepted his plea and sentenced him to an eighty-five month term of imprisonment and ordered him to pay restitution in the amount of $953,255.31. Robinson timely noted his appeal.

Robinson claims that his counsel was ineffective for failing to investigate his mental and emotional status to determine his mental capacity at the time of the crimes and his competency to stand trial. He also alleges that his counsel was ineffective for failing to contest allegations of other relevant conduct at the guilty plea and sentencing hearings. Robinson's final ineffective assistance claim is that his counsel failed to impeach the testimony of the Government's main witness at sentencing.

Generally, claims of ineffective assistance of counsel are not appropriate on direct appeal. Claims of ineffective assistance should be raised in a motion pursuant to 28 U.S.C.A. § 2255 (West 1994 & Supp. 1998), unless it conclusively appears from the record that counsel did not provide effective assistance. See United States v. Fisher, 477 F.2d 300, 302 (4th Cir. 1973). A review of the record in this case does not reveal any conclusive evidence that Robinson's trial counsel

was ineffective.[1] Therefore we find that it is more appropriate for Robinson to bring these claims in a § 2255 motion.

The Sentencing Guidelines provide for a base offense level of six for crimes involving fraud or deceit and then set forth a schedule for incrementally increasing the offense level according to the amount of loss suffered as a result of the fraud. USSG § 2F1.1. "Loss" is generally defined as "the value of the property taken, damaged, or destroyed." USSG § 2F1.1, comment. (n.7); USSG § 2B1.1, comment. (n.2).

Robinson claims on appeal that the amount of the actual loss was incorrectly calculated. The district court determined the amount of total loss to be $579,675, and increased the offense level by ten to an offense level of sixteen. See USSG § 2F1.1. However, Robinson did not raise in the district court four of the issues regarding the loss that he currently argues on appeal. These claims regarding the reduction of loss have thus been forfeited, see United States v. Bell, 5 F.3d 64, 66 (4th Cir. 1993), and they receive only plain error review. See United States v. Olano, 507 U.S. 725, 731-32 (1993). We do not find plain error in the calculation regarding these claims.

The first of the forfeited claims Robinson argues is that the appraised value for eight lots purchased by FDS comprising the Piscataway Estates should be deducted from the total amount of loss. Robinson states that the lots were appraised by Charles County, Maryland, for a total value of $585,000. Robinson did not seek to have the loss reduced by this amount or present evidence of the appraisal to the district court and does not present any documentary evidence of it on appeal. In addition, he also attempts to include the purchase price in the reduction of loss resulting in a double counting of that value. We therefore do not find plain error in the district court's failure to include the appraised value to reduce the total loss.

In the next forfeited claim, Robinson seeks to reduce the loss by

_____

[1] Regarding the issue of failure to contest relevant conduct, it appears from the record before us that, at the sentencing hearing, Robinson's trial counsel did in fact vigorously contest the relevant conduct attributed.

5

$135,000 for renovations to the Hilton Street property owned by IIC.**2** In his sentencing memorandum, Robinson did not object to the Government's estimation of the renovations cost as $60,000 based upon his own prior representations to IIC investors. The amount Robinson now attempts to include is the same information given to the Government prior to sentencing and is based upon receipts and other documents relating to renovations. As the Government sufficiently proved, the increase in cost Robinson represented is due to accounting errors such as double counting costs by submitting a delivery invoice as a charge and a paid credit card bill for the same expense. He also submitted a receipt for work done on the Hilton Street property before IIC even purchased it. We therefore find that the district court did not plainly err by not including the added cost represented by Robinson.

The last two forfeited claims -- that the loss should be reduced by the salary Robinson paid to himself in 1992 and 1993, and by the amount of a loan repayment from Anthony DeFeo -- were not before the district court at all as sources for reduction of loss. In addition, Robinson does not provide any evidence of the amount of salary paid or agreed upon, or the amount returned to FDS or TMR by DeFeo. We therefore find that the district court did not commit plain error by not considering these items.

The remaining disputed issues that Robinson raises are that the district court erred in determining the actual loss because it did not reduce the amount of loss by the proper value of the eight lots purchased as the Piscataway Estates by FDS, and in finding that the loss should not have been reduced by the amount of loans paid to private contractors by FDS.**3** The district court's finding of loss is a factual one, to be set aside only if clearly erroneous. See United States v. Rothberg, 954 F.2d 217, 219 (4th Cir. 1992) (citing United States v.

_____

**2** Of the $135,000 by which Robinson seeks to reduce the loss, $60,000 was already taken into account to reduce the loss suffered by IIC investors. Robinson thus attempts to apply the $60,000 twice to reduce the loss.

**3** Robinson also included legitimate business expenses in the amount of $78,433 as an amount that is required to be deducted from the total loss. The Government argued at sentencing that this is the total amount of legitimate business expenses, so this amount is not in dispute.

6

Daughtrey, 874 F.2d 213, 218 (4th Cir. 1989)). Only a preponderance of the evidence need support these factual findings. See United States v. Engleman, 916 F.2d 182, 184 (4th Cir. 1990).

Robinson argues that the $138,000 of loans made by FDS to minority contractors should be deducted from the total loss. He argues that the loans were consistent with the mission of FDS and, although made without Vickers' approval, Vickers' approval was not necessary because he did not have veto power on this type of financial decision.[4] The Government contended that several of the contractors had repaid the loans directly to Robinson. Robinson disputed that he received payments for the loans. Robinson testified at the sentencing hearing that he did not have signed promissory notes from the contractors in the FDS files, except for four of the larger loans, that he received only $6000 repayment from all the outstanding loans, that he only reviewed the financial statements of two of the contractors FDS provided loans to before approving the loans, and that he did not have any securities for the loans or liens when he made the loans on behalf of FDS. Finally, the plea agreement stated that the prospect for repayment of the debts is doubtful. We therefore find that the district court's finding excluding most of these loans from the reduction of total loss was not clear error.

Robinson's final issue regarding the determination of actual loss is that the total loss should be reduced by $179,000, which he contends is the total of the purchase price and related expenses of the eight lots of Piscataway Estates. The Government contended that the purchase price was $170,871.06. Because Vickers testified at the grand jury proceedings that including the transactional costs associated with the purchase, the expenditures totaled $179,000, Robinson argues that the loss should be reduced by this amount. However, at sentencing, Vickers testified that after his grand jury testimony he recalculated the purchase price and associated transactional costs and found his prior testimony to be incorrect. We therefore find that the court did not

_____

[4] Vickers testified that he did have knowledge of one $30,000 loan made to one contractor. That amount was already considered by the Government in its reduction of total loss.

clearly err in finding that the amount of the purchase price set forth by the Government was correct.[5]

Robinson assigns error to the district court's two-level enhancement for misrepresenting that he was acting on behalf of a charitable or religious organization. Section 2F1.1(b)(3)(A) provides that if the offense involved "a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious or political organization" the offense level is increased by two. Robinson contends that the enhancement does not apply to his conduct because the investors in TMR intended to invest with the organization to make a good return on their investment and that he did not represent that investments would be used for charitable or religious purposes.

Four people invested a combined total of $80,000 for investment on behalf of TMR: Morris and Twyla Vickers ($30,000); Warren Burnham ($40,000); and Janet Rutherford ($10,000). Each investor understood that his money would be reinvested by TMR with Zinman & Associates at a high rate of return, averaging fifteen to twenty-five percent annually for the individual investors, while also generating significant additional funds that TMR could use to carry out its educational and religious purposes.

The FBI took statements from Burnham and Vaughn as part of its investigation ("302 reports"). In Vaughn's 302 report, he stated that Robinson indicated to him that he would establish a monetary account for TMR. The purpose of the account was to provide donations to the needy, fund enhancement programs, and pay overhead expenses. Burnham's 302 report indicated that he possessed the articles of incorporation of TMR, which included identification of a number of ministers as the incorporators of the organization. Rutherford stated that she was interested in receiving a good rate of return on her investment and decided that TMR was a good place to invest, if her money could be used for a good purpose and still earn a good rate of return.

_____

[5] Even if we did find $179,000 to be the correct amount, the reduction would not result in a lower offense level.

8

The enhancement recognizes that "defendants who exploit victims' charitable impulses . . . create particular social harm." USSG § 2F1.1 comment. (backg'd). Even when a defendant acts in part for himself and in part for charitable purposes, the enhancement applies. See United States v. Marcum, 16 F.3d 599, 603 (4th Cir. 1994). While it may be that Robinson informed TMR investors that their investment would be used primarily to earn money for themselves, the statements of Vaughn, Burnham, and Rutherford clearly demonstrate their understanding that a portion of their returns would go to the charitable and religious purposes of TMR. We find that the district court did not clearly err in finding that Robinson represented that a portion of the proceeds of the TMR investments would be used for charitable or religious purposes, therefore, we hold that the enhancement was properly applied.

Finally, Robinson argues that the restitution order should not have included losses by the IIC investors.[6]  This court reviews restitution orders under the Victim and Witness Protection Act (VWPA), 18 U.S.C.A. §§ 3663, 3664 (West Supp. 1998), for abuse of discretion. See United States v. Blake, 81 F.3d 498, 505 (4th Cir. 1996). Robinson's plea agreement states that under the terms of the agreement, "he will be liable to pay restitution for all of the criminal conduct detailed in the attached Statement of Facts if the court determines that he has the financial ability to make restitution." (R. 4). The attached statement of facts included the fraud-related losses to IIC investors. If the parties agree to a restitution amount in the plea agreement, the plea agreement controls. Therefore, the restitution ordered by the court was authorized, notwithstanding the offense of conviction. See United States v. Broughton-Jones, 71 F.3d 1143, 1147 (4th Cir. 1995). Although a specific amount was not agreed to, the plea agreement's statement of facts clearly outlines the losses attributed to Robinson's conduct. Even if the plea agreement did not control, the losses are includable as part of the restitution order because they are part of the entire fraudulent scheme for which Robinson was indicted. See United States v. Henoud, 81 F.3d 484, 489 (4th Cir. 1996). We there-

_____

[6] Robinson also challenges the inclusion of $18,000 in credit card frauds in the restitution order. However, our review of this order discloses that the charges were not included.

9

fore find that the district court did not abuse its discretion in including the IIC losses in the restitution order.

We therefore affirm the judgment. We deny Robinson's motion to expedite the appeal. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED

10